IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Christina L. Kelley,                    :

      Plaintiff,                   :

    v.                               :     Case No. 2:14-cv-367

                       :     JUDGE ALGENON L. MARBLEY
Commissioner of Social Security,        Magistrate Judge Kemp

      Defendant.                   :

REPORT AND RECOMMENDATION

I.  Introduction

Plaintiff, Christina L. Kelley, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income.  Those applications were filed on June 2, 2010, and alleged that Plaintiff became disabled on June 1, 2004.

After initial administrative denials of her claim, Plaintiff was given a video hearing before an Administrative Law Judge on November 8, 2012.  In a decision dated December 12, 2012, the ALJ denied benefits.  That became the Commissioner's final decision on March 4, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on June 23, 2014.  Plaintiff filed her statement of specific errors on July 17, 2014, to which the Commissioner responded on September 14, 2014.  Plaintiff filed a reply brief on October 6, 2014, and the case is now ready to decide.

II.  Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 38 years old at the time of the administrative hearing and who has a high school education,

testified as follows.  Her testimony appears at pages 35-54 of the administrative record.

Plaintiff last worked in 2005, and possibly in 2006, doing data entry at an auto auction.  Her other past work consisted of data entry or customer service positions like cashier.  She felt she could not work because she could not sit or stand for extended periods of time and was easily distracted.  She took sixteen different medications on a daily basis, and some of them, such as pain medications and muscle relaxants, caused drowsiness.

Plaintiff testified to constant pain in her lower back, knees, and feet.  Sometimes it radiated into her upper legs.  Walking or prolonged sitting aggravated her pain, and she would change positions often.  She could sit for no more than twenty to thirty minutes at a time, and could stand for five to ten minutes.  She could not walk a full block and used a scooter when shopping.  She could lift a gallon of milk, but could not kneel, crawl, stoop, squat, or crouch.  She napped during the day.  She was able to cook and do dishes but not mop or run the vacuum.  Occasionally, she also did laundry and cleaned her home.

Additionally, Plaintiff testified she took medication to reduce her need to use the bathroom, but she still needed to do so every twenty minutes or so.  She had asthma which was triggered by dust or vegetation.  She cried frequently due to depression and isolated herself from others.  Being around others caused panic attacks, and she did not think she could interact successfully with coworkers or the public.

### III.  The Medical Records

The medical records in this case are found beginning on page 286 of the administrative record.  The pertinent records can be summarized as follows.

### A.  Physical Impairments

In 2008, Plaintiff had problems with right knee pain.  An

-2-

MRI done on April 7, 2008, showed a small effusion and a ligament strain as well as a meniscal tear and osteoarthritis. (Tr. 309). She reported left knee pain in later that year, which was also diagnosed as osteoarthritis. (Tr. 403). Physical therapy was recommended.

Plaintiff was seen for her diabetes in 2009 and 2010. Although diabetes education was recommended, Plaintiff reported that due to back pain she could not attend. She also had uncontrolled right thigh pain which might have been due to diabetes. At that time, she was experiencing frequent urination, but only at night, plus fatigue and shortness of breath. (Tr. 407-09).

Dr. Powers examined Plaintiff on June 15, 2010. At that time, Plaintiff's right thigh pain had improved. She continued to have chronic low back pain. Straight leg raising was negative. Dr. Powers thought that a medication absorbed through the skin, such as a lidocaine patch, might be useful, as might a supervised conditioning exercise program. (Tr. 498-99).

On March 14, 2011, Plaintiff was seen by Dr. Whitehead for a consultative physical examination. Her most significant symptom was back pain. The only treatment she was receiving was a prescription for Vicodin. She reported she could sit for 30 minutes, stand for 5 minutes, and do some light chores and shopping. She also had bilateral knee pain made worse by climbing stairs or prolonged sitting, standing, or kneeling. She was morbidly obese. She denied any illegal drug use. Her spinal exam showed some diffuse tenderness without muscle spasm, and straight leg raising was negative. She could walk on her heels and toes. Dr. Whitehead thought she would be best suited for sedentary work and "would need the ability to sit and stand as needed for comfort." (Tr. 560-63).

Dr. Bolz, a state agency reviewer, completed a physical

-3-

residual functional capacity assessment form on April 13, 2011.
The form indicates a capacity for sedentary work with some
limitations on postural activities and a need to avoid
concentrated exposure to environmental irritants and hazards.
Plaintiff's allegations about the severity of her symptoms were
viewed as not entirely credible.  (Tr. 580-87).  Dr. Hinzman
later agreed with that assessment after reviewing additional
records from Dr. Christales.  (Tr. 633).

B.  Psychological Impairments

    There are numerous records of mental health counseling from
2006, 2007 and 2008.  The notes on those records are difficult to
read, but they do show that her general complaints included
isolation, irritability, low self esteem, and lack of motivation.
She often presented as frustrated and sometimes was depressed and
angry.  A diagnostic assessment done in early 2010 noted that
Plaintiff had become frustrated with medications, had
discontinued them, and was uncertain if she wanted to continue
seeing a psychiatrist.  She was going to continue with twice-
monthly counseling sessions.  She also reported daily depression
and isolation with severe mood swings and panic attacks.  She
told her counselor she had worked at a Wendy's for three weeks in
2006 before quitting.  She was using marijuana several times a
week and used cocaine occasionally.  Plaintiff reported her
medical conditions as asthma, acid reflux, and migraine
headaches, and said she was not very compliant with taking her
medications.  She described problems with memory and
concentration but could, with help, care for herself and her
children.  Her diagnoses included bipolar disorder, post-
traumatic stress disorder, and cannabis dependence, and her GAF
was rated at 45.  The assessment is signed by Joe Rogers, a
licensed independent social worker.  (Tr. 472-81).

    Plaintiff underwent a psychological consultative examination

-4-

on March 23, 2011, done by Dr. Smith.  Dr. Smith also reviewed
some prior treatment records.  Plaintiff told Dr. Smith she quit
her last job because she got bored with it.  She said she was
very temperamental and did not like people telling her what to
do.  Her days were spent watching television and sleeping.  She
saw her father frequently.  Her thoughts were logical and goal
directed, and her mood was normal although her affect was
somewhat flat.  She did not appear anxious and did not report
panic attacks.  Her memory appeared intact.  Dr. Smith concurred
in the diagnoses of bipolar disorder and PTSD and rated
Plaintiff's symptom GAF as 45 to 50 and her functional GAF at 55.
She thought that due to low normal intellectual functioning that
Plaintiff could understand and apply simple work instructions,
would have difficulty working with others, and might have
outbursts of anger in a work setting.  Dr. Smith also expressed
concern about Plaintiff's ability to maintain concentration and
attention for a full workday or work week.  (Tr. 570-76).

Dr. Nordbrock reviewed these records and completed a mental
residual functional capacity assessment form.  He noted the
presence of bipolar disorder with functional limitations due to
depression and thought it imposed moderate limitations in the
areas of activities of daily living and in maintaining social
functioning, but only mild difficulties in maintaining attention
and concentration.  In his view, Plaintiff would have limitations
in dealing with detailed instructions, working near others, and
dealing with changes in the work setting and with work stress.
Like Dr. Bolz, Dr. Nordbrock found her statements only partially
credible, and he concluded that she could perform simple tasks
with adequate pace and persistence if she was not subjected to
excessive supervision.  (Tr. 588-602).  Dr. Voyten subsequently
confirmed that analysis.  (Tr. 630).

Plaintiff continued to be seen by North Central Mental

-5-

Health Services, Inc., throughout 2011 and 2012.  The notes again
reflect poor compliance with medications, both psychotropic and
physical.  Her treating psychiatrist, Dr. Bobba, completed a form
on October 16, 2012, which indicated marked impairments in making
simple work judgments and interacting with the public, a marked
inability to respond to usual work situations, and an extreme
inability to interact with coworkers or supervisors.  The stated
basis of these conclusions was "Psychiatric Assessment on 8-17-
10." (Tr. 903-05).

IV.  The Vocational Testimony

Mary Harris was the vocational expert in this case.  Her
testimony begins on page 54 of the administrative record.

Ms. Harris testified that Plaintiff's past work included
data entry, receptionist, and cashier.  Those jobs were either
semi-skilled or unskilled, and were performed at the light or
sedentary exertional levels.

Ms. Harris was then asked some questions about a
hypothetical person who could work only at the sedentary
exertional level and who could not climb ladders, ropes, or
scaffolds, or work around unprotected heights and hazardous
machinery.  He or she needed to avoid concentrated exposure to
fumes, odors, dust, gases, and poor ventilation.  The person
could also occasionally stoop, kneel, crouch, and crawl.
Finally, the person could understand, remember, and carry out
simple instructions, could maintain attention and concentration
with regular breaks, and could interact with the public or
coworkers only occasionally and superficially.  According to Ms.
Harris, someone with those limitations could not do Plaintiff's
past work, but he or she could work as a final assembler,
electrical assembler, or small products assembler.  She gave
numbers for those jobs in the State and national economies.

Ms. Harris was then asked how certain marked psychological

-6-

limitations would affect the ability to do those jobs, and she
said that those were work-preclusive. Someone who was off task
fifteen percent of the time, had to take unscheduled breaks, or
who would miss two or more days of work per month also could not
be competitively employed.

V. <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 14-
25 of the administrative record. The important findings in that
decision are as follows.

The Administrative Law Judge found, first, that Plaintiff
met the insured status requirements of the Social Security Act
through September 30, 2009. Next, he found that Plaintiff had
not engaged in substantial gainful activity since her alleged
onset date of June 1, 2004. Going to the second step of the
sequential evaluation process, the ALJ determined that Plaintiff
had severe impairments including obesity, asthma, diabetes
mellitus, degenerative joint disease, bipolar disorder, and
posttraumatic stress disorder. The ALJ also found that these
impairments did not, at any time, meet or equal the requirements
of any section of the Listing of Impairments (20 C.F.R. Part 404,
Subpart P, Appendix 1).

Moving to the step four of the sequential evaluation
process, the ALJ found that Plaintiff had the residual functional
capacity to perform work at the sedentary exertional level, but
she could only occasionally stoop, kneel, crouch, and crawl, and
she could not climb ladders, ropes, or scaffolds or be exposed to
concentrated environmental irritants or hazards, including
unprotected heights and dangerous machinery. Further, she could
understand, remember, and carry out simple instructions, could
maintain attention and concentration with regular breaks, could
sustain ordinary routines without special supervision, and could
interact with the public or coworkers only occasionally and

-7-

superficially.

The ALJ found that, with these restrictions, Plaintiff could not do her past work.  However, he also determined that she could do the jobs identified by the vocational expert, including assembler of various products.  The ALJ further found that such jobs existed in significant numbers in the State and national economies.  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

VI.  Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises these issues: (1) the ALJ did not properly evaluate the treating source opinions; (2) the ALJ did not correctly determine Plaintiff's physical residual functional capacity; and (3) the ALJ did not properly evaluate other medical opinions in the record.  These issues are evaluated under the following legal standard.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d

-8-

383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A.  The Treating Source Opinion Evidence

The only treating source opinion came from Dr. Bobba. Plaintiff argues that the ALJ did not articulate good reasons for rejecting that opinion, as is required by 20 C.F.R. §404.1527(c), and that the Court must therefore find the ALJ's decision to be unsupported by substantial evidence.

Any analysis of this issue begins with what the ALJ actually said about the treating source opinion.  There is no question that the explanation for this portion of the ALJ's decision is terse.  It consists of this paragraph:

> Turning to available medical opinions, the claimant's treating physician, Dr. Bobba, completed a medical source statement in October of 2012.[] Dr. Bobba identified a number of marked and extreme mental limitations, including increased anxiety around others. []  I am unable to give much weight to this statement, as it fails to identify what the claimant remains capable of despite her impairments.  Notably, such marked and extreme limitations stand in contrast to generally stable mental status examinations between 2006 and 2012 (Exhibit 3F, 6F, 18F, 23F, and 27F).

Tr. 22.  The exhibits to which the ALJ refers are all counseling notes from North Central Mental Health Services.  The ALJ augmented this explanation by giving "great weight" to the contrasting views of Dr. Voyten, finding them "consistent with the remainder of claimant's medical record and hearing testimony" - a rationale also applied to the opinion of Dr. Hinzman, the state agency physician who evaluated Plaintiff's physical

impairments.  Id.  The ALJ mentioned the consultative examination performed by Dr. Smith (Tr. 21), but did not recite Dr. Smith's conclusions, nor did he ascribe any particular weight to them, neither expressly accepting nor rejecting them.

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once.  20 C.F.R. §404.1527(c); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981).  However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion.  Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990).  The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living.  Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994).  No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision.  Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

The Commissioner defends the ALJ's articulation of the reasons for rejecting Dr. Bobba's opinion by asserting that the administrative decision provided the required statement of "good reasons."  The Commissioner asserts that the inconsistency with the treatment notes is a good reason for rejecting the opinion of a treating source, and points out that the treatment notes - to

-10-

the extent they can be deciphered - all show that Plaintiff
presented for her mental health appointments as being clean,
cooperative, possessing normal intelligence, and being free from
suicidal or homicidal thoughts.

The balance of the Commissioner's argument, however, drifts
off into speculation about what other bases the ALJ might have
had for rejecting Dr. Bobba's opinion - things such as its
inconsistency with Plaintiff's activities of daily living, the
fact that the opinion was expressed on a "check the box" form,
and the failure to take into account missed appointments and
medication noncompliance.  While those matters might constitute
substantial evidence which supports the ALJ's conclusion, they
are not reasons given by the ALJ for rejecting Dr. Bobba's
opinion, and the Court may not consider them.  See Mercer v.
Commissioner of Social Sec., 2013 WL 3279260, *5 (S.D. Ohio June
27, 2013) ("the Court must rely on the ALJ's statement of reasons
why a treating source opinion was rejected and may not attribute
reasons to the ALJ which are not stated in the administrative
decision"), adopted and affirmed 2014 WL 197874 (S.D. Ohio Jan.
15, 2014).

Before turning to the question of whether the ALJ's
reference to the North Central treatment notes properly supports
the rejection of Dr. Bobba's opinion, the Court comments briefly
on the ALJ's decision to adopt the opinion of the state agency
reviewer because it was consistent with Plaintiff's testimony and
the medical record.  If this is considered part of the rationale
for rejecting Dr. Bobba's opinion in favor of that of the state
agency reviewer, it does not satisfy the articulation requirement
set in out in §404.1527(c).  The ALJ's statement is entirely
conclusory and fails to point out what portion of Plaintiff's
testimony, or what portion of the medical record, is consistent
with Dr. Voyten's opinion (and presumably inconsistent with Dr.
Bobba's).  "[I]t is not enough to dismiss a treating physician's

-11-

opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." Friend v. Comm'r of Social Security, 375 Fed. Appx. 543, 552 (6th Cir. Apr. 28, 2010). The ALJ's statement in this case does not meet that standard.

What is left, then, is the ALJ's citation to five exhibits - all treatment notes from Dr. Bobba's own organization - as not supporting Dr. Bobba's opinion. The Commissioner speculates that the parts of those records which do not support Dr. Bobba's views are the comments about Plaintiff's presentation at each of the sessions. But the ALJ did not say that, and on this record, that is a significant omission.

The North Central notes contain a wide variety of information in addition to that referred to in the Commissioner's memorandum. For example, Exhibit 6F, an intake form dated February 16, 2010, describes Plaintiff as "having trouble sleeping, decreased appetite, frequent crying spells, intense anxiety and depressed mood" and noted that she "tends to isolate herself, reports fatigue, poor concentration and poor memory" with "frequent mood swings and anger outbursts." Her GAF was rated at 45, indicative of serious symptoms. Exhibit 23F, another record cited by the ALJ, is 32 pages long. In addition to the portions relied on in the Commissioner's memorandum as showing a normal presentation, it reflects these matters: increased psychomotor activity, pressured speech, abnormal concentration and attention, and immediate memory deficits. (Tr. 649). That same exhibit reports Plaintiff's statement that she was "flipping out" and that Plaintiff was "very angry." Id. Another page of the same exhibit reports paranoid delusions. (Tr. 651). Given the wide range of information in these five fairly lengthy exhibits, any statement that they are "generally" unsupportive of Dr. Bobba's opinion needs significant expansion

and clarification before it can serve as a "good reason" for rejecting the opinion of a treating source.

As it stands, the Court has no way of knowing what information in these exhibits the ALJ found to be inconsistent with the treating source opinion, nor why the ALJ discounted those statements which tend to support that opinion.  The ALJ's conclusion is simply unreviewable.  A remand will permit the ALJ to explain to Plaintiff and to the Court how he reached his conclusions, including what portions of the treatment notes he found to be unsupportive of Dr. Bobba's opinion and how he dealt with the remainder.  It will also provide a further opportunity for the ALJ to include in his decision "a discussion or consideration of whether ... any weight was due the[] medical source opinion[] under any of the remaining factors of the Regulations," Hardy v. Commissioner of Social Sec., 2013 WL 4546508, *6 (S.D. Ohio Aug. 28, 2013), adopted and affirmed 2014 WL 1091718 (S.D. Ohio March 18, 2014), citing Wilson, supra - something also absent from the administrative decision.

B.  Plaintiff's Physical Limitations

In her next claim of error, Plaintiff notes that the ALJ found her to be capable of performing essentially a full range of sedentary work.  That means that he found her capable of sitting for two-hour segments, up to six hours in a work day.  But Dr. Whitehead, whose opinion was given great weight by the ALJ, thought that Plaintiff would need to be able to alternate between sitting and standing.  Plaintiff contends that the ALJ did not adequately account for this limitation nor offer any explanation for why it was not accepted along with the balance of Dr. Whitehead's views.

In response to this claim of error, the Commissioner argues at length why the record does not necessarily support the conclusion that Plaintiff needed a sit/stand option.  In her reply, Plaintiff asserts that this misses the point; as she

states, "How could the ALJ reasonably determine that if he did not even mention that Dr. Whitehead opined the limitation?" Reply Memorandum, Doc. 16, at 4.  The Court finds Plaintiff's position on this issue the more persuasive.

The question is not, as the Commissioner conceives it, whether the ALJ could reasonably have chosen not to credit Dr. Whitehead's statement about a sit/stand option.  The question is what the ALJ actually did.  Here, he assigned "substantial weight" to Dr. Whitehead's opinion and found it to be "largely consistent with the medical evidence of record."  For those reasons, he said that he "incorporated the recommendations into the residual functional capacity finding." (Tr. 22-23).  But he did not do that, at least as it relates to the sit/stand option, nor did he either explain why not, or even acknowledge an awareness of that portion of the opinion.  The only conclusion to be drawn from the language used by the ALJ is that he overlooked that part of Dr. Whitehead's opinion and made no reasoned determination about whether it was credible.

Under Social Security Ruling (SSR) 96-8p, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence."  The ALJ does not appear to have followed this directive.  While the ALJ need not discuss every piece of evidence in the administrative decision, in some cases – particularly if the evidence is important to the ultimate decision – "[w]hen evidence is not discussed, the Court is unable to determine whether the ALJ considered the evidence and assigned weight in accordance with the applicable legal standards." Basse v. Astrue, 2010 WL 2523106, *6 (S.D. Ill. June 21, 2010).  As this Court said in Porter v. Comm'r of Social Security, 2014 5469851, *5 (S.D. Ohio Oct. 28, 2014),quoting Morris v. Secretary of Health & Human Serv's., 1988 WL 34109, *2 (6th Cir. Apr. 18,

-14-

1988)(which in turn quoted <u>Cotter v. Harris</u>, 642 F.2d 700, 705 (3d Cir. 1981)), "[w]hen an ALJ fails to mention relevant evidence in his decision, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" That is the case here with Dr. Whitehead's opinion concerning a sit/stand option, and Plaintiff's second claim of error provides an independent basis for ordering a remand.

C.  <u>Other Sources</u>

In her last assignment of error, Plaintiff asserts that the ALJ erred in his cursory review, and nonexistent evaluation, of Dr. Smith's consultative examination and conclusions. She also claims that he completely ignored six years' worth of progress notes from Mr. Rogers, the social worker who provided psychological counseling to Plaintiff at North Central. While she acknowledges that the ALJ had no obligation to explain his views about every page of medical records, she contends that he did have an obligation to give these records a meaningful review, and that there is no indication in his decision that he did so.

The Commissioner responds that because Dr. Smith only expressed concern about Plaintiff's ability to do certain work-related functions, but did not impose specific functional limitations, the ALJ was not obligated to discuss her report. While portions of it may not constitute medical opinions as such, the ALJ was still required to consider the report for whatever evidentiary value it had. His statement that the opinions of the state agency mental health reviewers were consistent with all of the evidence of record, which makes no mention of Dr. Smith's report, is a strong indication that he did not properly consider or evaluate that piece of evidence. The remand to be ordered will permit the ALJ to give more consideration to Dr. Smith's report. It will also require the ALJ to scrutinize the North Central records in greater detail, which should permit adequate consideration of the observations made by Plaintiff's counselor -

-15-

which, even though they may not be medical source opinions, are part of the record and must be considered.  See, e.g., 20 C.F.R. §404.1529.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge

-16-